IRVINE et al., Appellees and Cross–Appellants,

v.

AKRON BEACON JOURNAL et al., Appellants and Cross–Appellees.*

Court of Appeals of Ohio,
Ninth District, Summit County.

Nos. 20450 and 20524.

Decided May 8, 2002.

---

* Reporter's Note: Upon reconsideration, the decision previously filed in this case, *Irvine v. Akron Beacon Journal*, 9th Dist. Nos. 20450 and 20524, 2002-Ohio-83, 2002 WL 24324, was vacated and replaced with this decision and journal entry. An appeal to the Supreme Court of Ohio is pending in case No. 2002-0785. The Supreme Court granted a stay in 95 Ohio St.3d 1473, 2002-Ohio-2444, 768 N.E.2d 1181.

430

Ronald S. Kopp, Stephen W. Funk and Alisa L. Wright, for appellants and cross-appellees.

Edward L. Gilbert, for appellees and cross-appellants.

---

BATCHELDER, Presiding Judge.

{¶ 1}   Appellant, Akron Beacon Journal ("Beacon Journal"), appeals from a judgment of the Summit County Court of Common Pleas that awarded compensatory and punitive damages to appellees, Edward and Geneva Irvine, on their claims against Beacon Journal for invasion of privacy and for violations of the Telephone Consumer Protection Act. Beacon Journal also appeals from a post-judgment order that awarded attorney fees to the Irvines.  The Irvines appeal from another order of the trial court that stayed the judgment but did not require Beacon Journal to post a bond.  We affirm in part and reverse in part.

I

{¶ 2}   On October 5, 1999, the Irvines filed this action against Beacon Journal, one of its reporters, one of its photographers, and members of its editorial staff, alleging statutory and tort claims based upon alleged newsgathering and tele-marketing activities by the defendants.  The matter commenced to a jury trial, which revealed the following facts underlying the Irvines' claims.

## Newsgathering Claims

{¶ 3}   Because these claims are not at issue in this appeal, the underlying facts will be detailed only briefly.  Mr. Irvine is the former chief of the Akron Police Department.  During October 1998, Mrs. Irvine was treated for injuries at a local hospital and, while there, made allegations that her husband had caused

her injuries. Mrs. Irvine later recanted her statements. This incident led to, among other things, a criminal investigation, an internal investigation by the police department, and several articles in the Beacon Journal about the allegations of domestic abuse and the subsequent investigations into those allegations. During this period, Mrs. Irvine went to Louisiana to stay with her sister. In an attempt to get Mrs. Irvine's side of the story, Beacon Journal attempted to contact Mrs. Irvine while she was in Louisiana. The Irvines' complaint alleged that the actions taken by Beacon Journal reporters and others constituted an invasion of Mrs. Irvine's privacy.

## Telemarketing Claims

{¶ 4} The bulk of this appeal focuses on Beacon Journal's telemarketing practice, and its impact on the Irvines, during the spring and summer of 1999. During the summer of 1999, the Irvines' household was receiving numerous "hang-up" telephone calls. Because the caller identification indicated only that these calls came from a private line, Chief Irvine was unable to determine the source of the calls. Consequently, he filed a criminal telephone harassment complaint, and Ameritech placed a trap on the Irvines' phone line. The Ameritech trap revealed that several of the hang-up calls that the Irvines had received had come from Beacon Journal's telemarketing department. Three of those calls rang into the Irvines' home during early morning hours. Due to the volume of such calls that the Irvines allegedly had received, and because they believed that some of the calls violated the federal Telephone Consumer Protection Act, the Irvines added claims to their complaint based on the federal Act and common law invasion of privacy.

{¶ 5} During the relevant period of time, Beacon Journal's telemarketing department was equipped with an automatic dialing machine that would be programmed to dial specific telephone numbers. During business hours, the autodialer was used to maximize the productivity of Beacon Journal's sales force. With Beacon Journal's emphasis on productivity, there were many ways by which solicitation targets might receive "hang-up" calls from its telemarketing department. Rather than having a sales representative waste time making calls that would not result in a connection with a potential subscriber, the autodialer was used to call multiple telephone numbers at once. The autodialer would call two phone numbers for every sales representative working and would connect the calls to a sales representative only after someone answered at the other end. If the call was not answered within the first three rings, the autodialer dropped it. The recipient of such a call would be able to identify the call only as a hang-up call, unidentifiable by their caller ID.

{¶ 6} If the autodialer made multiple connections at the same time, there was sometimes no sales representative available to take the call. In those situations, the autodialer would hang onto the call for a short period of time in case a sales representative became available. If no sales representative became available within a set period of time, the call was dropped. A person answering such a call would hear nothing but dead air and a hang up. The autodialer would place the telephone number for such a "dropped call" back on the dialing list and call it again later. A specific telephone number could potentially be called numerous times before an actual connection with a sales representative was made.

{¶ 7} During this period, Beacon Journal's subscription sales force heavily targeted two particular groups of relevance here: former subscribers and newly connected telephone numbers. Beacon Journal attempted to win back its former subscribers by calling them "as much as possible" during the first weeks after cancellation of a subscription. Beacon Journal's telemarketers also focused on newly connected telephone numbers because those telephone numbers potentially belonged to new members of the community who were typically good prospects for newspaper subscription sales.

{¶ 8} Beacon Journal compiled a list of newly connected telephone numbers through the following process. Every weekend, after the regular sales calls were made, Beacon Journal programmed its autodialer to dial the "disconnect list," a list of telephone numbers that Beacon Journal previously had determined were not working telephone numbers. The autodialer would call the telephone numbers from the preprogrammed disconnect list and record one of two things: (1) a three-toned signal, indicating that the number remained disconnected, or (2) a ring, indicating that the number had been reconnected and was currently a working telephone number. Either way, once the autodialer detected one of those two sounds, it recorded the information and dropped the call. Even if the call was answered, the call was not connected to a sales representative because they were not working at the time.

{¶ 9} If the disconnect list was programmed into the autodialer properly and the autodialer was working properly, each telephone number on the list would be called only once, and the machine would record whether that number remained disconnected or whether it was a newly connected number.

### The Irvines' Inadvertent Role as Telemarketing Targets

{¶ 10} During the spring and summer of 1999, the Irvines inadvertently became targets of Beacon Journal's telemarketing department for two reasons. During the spring of 1999, the Irvines canceled their subscription to the Sunday Beacon Journal. Consequently, they received numerous calls from the telemarketing department in an attempt to win back their business. According to the

testimony of Chief Irvine, Beacon Journal also called him numerous times before the subscription expired, seeking a renewal order.

{¶ 11} According to Chief Irvine, in an attempt to avoid annoying calls from the Beacon Journal and unidentified hang-up calls, he had their telephone number changed to a new, unlisted telephone number on June 22, 1999. Unfortunately for the Irvines, however, because their new phone number was a formerly disconnected number, changing the phone number merely set them up for additional telemarketing calls from Beacon Journal. Thus, even if everything had been working properly with Beacon Journal's telemarketing system, the Irvines had unknowingly become targets for numerous unsolicited calls.

### Problems with the System

{¶ 12} Beacon Journal's telemarketing system apparently was not working properly during the spring and summer of 1999, and many of the problems with the system directly impacted the Irvines. The computerized system crashed often, causing it to lose data. When data were lost, the autodialer would revert to the beginning of the preprogrammed list and call the telephone numbers again. The Irvines apparently received many calls for this reason.

{¶ 13} Other calls placed in violation of the federal Act, however, were due to human error. After business hours on two nights during late June and early July 1999, because the autodialer had not worked properly during its usual time for running the disconnect list, Beacon Journal set the machine to run all night. The list of newly connected numbers was a very important list to the telemarketing department. Beacon Journal's circulation sales manager was not willing to wait until the following weekend to run the disconnect list, apparently worried that Beacon Journal would potentially lose several subscription sales.

{¶ 14} During those two nights, the autodialer called the Irvines' telephone number a total of three times. In addition to the three late night calls, the Irvines' number was called on the disconnect list several other times. One call should have been enough for the computer to detect a ring and determine that the Irvines' number was a newly connected number. One Beacon Journal telemarketing person attempted to explain why the Irvines' number was called repeatedly. He opined that the number might have been inadvertently programmed into the system more than once and/or that the computer crashed and lost data so that the number was called again. On cross-examination, however, the witness essentially conceded that neither of these explanations fully explained why the Irvines' number was called so many times.

### Verdict

{¶ 15} At the close of the defendants' case, the trial court directed a verdict for the individually named defendants on the Irvines' telemarketing claims. The

jury found for the defendants on the newsgathering claims. The jury found for each of the Irvines against the Beacon Journal, however, on their claims for common-law invasion of privacy based on telephone harassment and for violations of the Telephone Consumer Protection Act.

{¶ 16} Based on its answers to special interrogatories, the jury indicated that Beacon Journal violated the Telephone Consumer Protection Act on three separate occasions when its autodialer called the Irvines' house between the restricted hours of 9:00 p.m. and 8:00 a.m. The jury awarded the Irvines $500 for each violation, for total statutory damages of $1500. The jury also found that the violations had been committed knowingly or willfully and awarded $4,500 in treble damages.

{¶ 17} The jury also found that Beacon Journal's telemarketing practices had invaded the privacy of each of the Irvines. On these claims, the jury awarded each of the Irvines $250 in compensatory damages and $100,000 in punitive damages. The trial court entered judgment on the jury verdict.

{¶ 18} Following a post-trial hearing before a magistrate, the Irvines were awarded $60,485.25 in attorney fees. The trial court adopted the magistrate's recommended award and overruled the objections raised by Beacon Journal.

{¶ 19} Beacon Journal appeals from those two orders, raising fourteen assignments of error, some of which will be consolidated for ease of discussion. The Irvines also appeal from a later order of the trial court that stayed the Irvines' judgment against Beacon Journal but did not require Beacon Journal to post a bond. The appeals were consolidated, and, though the appeals were from separate orders of the trial court, for briefing purposes, Beacon Journal was designated the appellant and the Irvines, the cross-appellants. Consequently, Beacon Journal's assignments of error will be addressed first, and then the Irvines' sole assignment of error, designated a cross-assignment of error, will be addressed.

## II

### First Assignment of Error

{¶ 20} "The trial court erred by returning the jury to further deliberations and not entering judgment in favor of the Beacon pursuant to Civ.R. 49(B) and/or correcting the jury's verdict in form, consistent with the jury's interrogatory answer that the Beacon did not invade the appellees' privacy in regards to telephone harassment."

{¶ 21} Beacon Journal contends that the trial court erred when, after the jury's initial deliberations, it failed to enter judgment on the jury's answers to special interrogatories that were inconsistent with the general verdict on the

Irvines' invasion of privacy claim. Specifically, the jury initially returned with a general verdict for the Irvines on this claim, with an award of compensatory damages of $250 each and an award of punitive damages of $100,000 for each of the Irvines. The general verdict form was signed by six of the eight jurors. The jury's answers to three of the special interrogatories, however, were inconsistent with the general verdict. Through those interrogatories, the jurors indicated that Beacon Journal did not invade the privacy of either of the Irvines in regard to telephone harassment, nor did it act with actual malice.[1]

{¶ 22} The trial court asked the jury to return for further deliberations, but, when the jury returned, it had completed the three interrogatories just as it had done before, except that it had failed to complete any general verdict form on this claim. The trial court sent the jury back again for further deliberations. The jury returned with a general verdict for the Irvines, with the same damages as it had initially awarded, and with answers to the three interrogatories that were consistent with its general verdict.

{¶ 23} Faced with an inconsistency between the general verdict and the answers to three of the interrogatories, there were three options available to the trial court:

{¶ 24} "* * * When one or more of the answers [to interrogatories] is inconsistent with the general verdict, [1] judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or [2] the court may return the jury for further consideration of its answers and verdict or [3] may order a new trial." Civ.R. 49(B).

{¶ 25} It is within the sound discretion of the trial court to determine which of these three actions to take. *Tasin v. SIFCO Industries, Inc.* (1990), 50 Ohio St.3d 102, 553 N.E.2d 257, paragraph one of the syllabus.

{¶ 26} Beacon Journal contends that the trial court abused its discretion by failing to enter judgment for Beacon Journal, based on the original answers to special interrogatories, the first option listed in Civ.R. 49(B). Beacon Journal's argument suggests that the option of entering judgment on the answers to interrogatories is the preferred action and that returning the jury for further deliberations is the action to be taken only in limited situations. On the contrary, the Ohio Supreme Court has often stated that the preferable option under Civ.R. 49(B) is to send the jury back for further deliberations. See, e.g., *Perez v. Falls Fin., Inc.* (2000), 87 Ohio St.3d 371, 375–376, 721 N.E.2d 47; *Shaffer v. Maier*

---

1. The original forms completed by the jury are not part of the record. This court's review therefore is limited to what is apparent from transcribed discussions between the trial judge and counsel. Beacon Journal also asserts an argument based on a fact that does not appear in the record. Consequently, that argument will not be addressed.

(1994), 68 Ohio St.3d 416, 421–422, 627 N.E.2d 986. In fact, if there is any restraint on the trial court's discretion in this situation, it is when the court is permitted to enter judgment on the answers to special interrogatories that are inconsistent with the general verdict. See *Otte v. Dayton Power & Light Co.* (1988), 37 Ohio St.3d 33, 41, 523 N.E.2d 835. Beacon Journal has failed to demonstrate that the trial court abused its discretion by sending the jury back for further deliberations until it resolved the inconsistency between the general verdict and the special interrogatories.

{¶ 27} Beacon Journal further contends that the trial court erred in its instructions to the jury when it sent the jury back for further deliberations. Although Beacon Journal raised an objection to the trial court's sending the jury back for further deliberations, it raised no objection to the manner in which court instructed the jury. Consequently, it waived all but plain error. See *Perez*, 87 Ohio St.3d at 375, 721 N.E.2d 47. Beacon Journal cites only two cases in support of its argument, one of which does not even address the issue, and the other was subsequently reversed on this issue by the Ohio Supreme Court. Therefore, Beacon Journal has failed to demonstrate error, much less that this was one of those rare situations in which the plain error doctrine should be invoked. See id. at 375–377, 721 N.E.2d 47. The first assignment of error is overruled.

## Second Assignment of Error

{¶ 28} "The trial court erred in instructing the jury on invasion of privacy based on telephone harassment."

{¶ 29} Through this assignment of error, Beacon Journal contends that the trial court erred in its jury instruction on the invasion of privacy claims. Although Beacon Journal raised several objections to the trial court's instruction on invasion of privacy, it has abandoned some of those arguments on appeal and has raised some new ones. "When a party fails to object to the giving of or failure to give a jury instruction before the jury retires to consider a verdict, the party may not assign as error the giving of or failure to give such instruction." *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001, paragraph one of the syllabus. Consequently, this court will address only the argument that Beacon Journal preserved for appeal through a timely objection.

{¶ 30} Beacon Journal asserts that the trial court erred by excluding from its instruction the language from Restatement of the Law 2d, Torts (1965), Section 652B, Comment *d*, that one, two, or even three telephone calls do not constitute an invasion of privacy. By excluding that language, Beacon Journal contends, the jury was misled to believe that two or three phone calls could constitute an invasion of privacy.

{¶ 31}   To demonstrate reversible error, Beacon Journal must demonstrate (1) that the trial court abused its discretion by failing to give the requested instruction, and (2) that it was prejudiced as a result. *Jaworowski v. Med. Radiation Consultants* (1991), 71 Ohio App.3d 320, 327, 594 N.E.2d 9. Beacon Journal has failed to demonstrate either error or prejudice.

{¶ 32}   The trial court gave a fairly detailed instruction on invasion of privacy, which included the following explanation:

{¶ 33}   "[I]t is only when telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the Plaintiffs that becomes a substantial burden to his existence that the Plaintiffs' privacy is invaded."

{¶ 34}   The inclusion of this language should have made it clear to the jury that more than two or three telephone calls were required before liability would attach. Beacon Journal has failed to demonstrate an abuse of discretion by the trial court.

{¶ 35}   Beacon Journal attempts to demonstrate confusion on the part of the jury by linking the common-law invasion of privacy telemarketing claims to the statutory telemarketing claims, suggesting that the jury verdicts against it on all telemarketing claims were based on the same three late night phone calls. The jury's answers to interrogatories indicate that those three calls formed the basis of Beacon Journal's statutory liability, but there was no special interrogatory to indicate the specific conduct that formed the basis of Beacon Journal's common-law invasion of privacy liability, for which the jury awarded the bulk of its damages. Although the jury found that only three telephone calls made by Beacon Journal violated the federal Act because they were made during restricted hours, telephone calls need not be made at a certain time of the day to constitute an invasion of privacy. The record contains evidence of many more telemarketing calls generated by Beacon Journal to the Irvines during other hours of the day. Thus, Beacon Journal's repeated suggestion that the invasion of privacy claims were based on a mere three phone calls is unfounded. The second assignment of error is overruled.

### Third Assignment of Error

{¶ 36}   "The trial court erred in denying the Beacon's motions for directed verdict and/or judgment notwithstanding the verdict on appellees' invasion of privacy claims based upon telephone harassment."

### Fourth Assignment of Error

{¶ 37}   "The jury's verdict on appellees' invasion of privacy claims based upon telephone harassment and the judgment entered thereon were contrary to law [and] against the manifest weight of the evidence."

{¶ 38}   We will address these assignments of error together because they are closely related.   Beacon Journal contends that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on the Irvines' claims for invasion of privacy based on telephone harassment.   Beacon Journal did not move for a directed verdict on this basis,[2] but it did move for a JNOV. Beacon Journal also contends that the judgment for the Irvines on these claims was against the manifest weight of the evidence.

{¶ 39}   The standard for granting a motion for judgment notwithstanding the verdict pursuant to Civ. R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ. R. 50(A).   *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 318–319, 662 N.E.2d 287.   Civ.R. 50(A)(4) provides:

{¶ 40}   "* * * When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 41}   "[I]t is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion."   *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 423 N.E.2d 467, citing *Durham v. Warner Elevator Mfg. Co.* (1956), 166 Ohio St. 31, 1 O.O.2d 181, 139 N.E.2d 10.   "[I]f there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied."   *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 363 N.E.2d 367, citing *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320, 27 O.O.2d 241, 199 N.E.2d 562.

{¶ 42}   When reviewing the weight of the evidence, this court applies the same test in civil cases as it does in criminal cases.   *Tewarson v. Simon* (2001), 141 Ohio App.3d 103, 115, 750 N.E.2d 176.   "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."   Id., citing *State v.*

---

**2.**   Although Beacon Journal moved for a directed verdict on the newsgathering invasion of privacy claim, it did not articulate an argument on the telephone harassment invasion of privacy claim.

*Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 43} The trial court instructed the jury on the telemarketing invasion of privacy claim, in relevant part, as follows:

{¶ 44} "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

{¶ 45} "* * *

{¶ 46} "In regard to the alleged telephone harassment and invasion of privacy, it is only when telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the Plaintiffs that becomes a substantial burden to his existence that the Plaintiffs' privacy is invaded."

{¶ 47} Beacon Journal contends that reasonable minds could only conclude, and that the jury lost its way in reaching a conclusion to the contrary, that Beacon Journal did not call the Irvines "with such persistence and frequency as to amount to a course of hounding" or to become a "substantial burden to [their] existence." This court does not agree.

{¶ 48} Although Beacon Journal again focuses solely on the three late-night phone calls, there was evidence before the jury that the Irvines received many other phone calls from Beacon Journal. Chief Irvine testified that they received hundreds of phone calls from Beacon Journal. During some calls, the caller identified himself or herself as being from the Beacon Journal. Many of the calls were "hang-up" calls, however. Beacon Journal contends that, other than the calls recorded by Beacon Journal and Ameritech, the Irvines did not prove that these calls came from Beacon Journal.

{¶ 49} The evidence demonstrated, however, that Chief Irvine filed a criminal complaint because he was receiving so many hang-up calls and could not identify the source of the calls on his caller ID. Once Ameritech placed a trap on his phone, many hang-up calls were identified as coming from Beacon Journal's telemarketing department. In fact, Beacon Journal's own records indicate that it placed six calls of short duration, presumably hang-up calls, to the Irvines' residence during the few days before the trap was put on the line.

{¶ 50} Beacon Journal repeatedly asserts that the Irvines' numbers are too high and stresses the fact that their numbers are not supported by the records of Ameritech or Beacon Journal. None of these records, however, included a full reporting of the calls placed by Beacon Journal to the Irvines' residence. The

Ameritech phone trap was only on the phone for twenty-one days of the relevant five-month period and recorded only those calls that the Irvines asked it to.

{¶ 51} Beacon Journal's records did not include any statistics for calls placed before May. Moreover, the Beacon Journal log failed to include some calls that were on the Ameritech log, indicating that the log did not record all calls placed to the Irvines. A Beacon Journal witness explained that the Beacon log would not record calls that were less than seven seconds in duration and that the system's crashing might cause it to lose data on other calls. Because there also was evidence before the jury that the autodialer system repeatedly crashed and lost data during this period, the jury could reasonably conclude that Beacon Journal's logs were not an accurate record of the number of calls placed to the Irvines' residence.

{¶ 52} This court cannot say that the jury lost its way in concluding that Beacon Journal called the Irvines "with such persistence and frequency as to amount to a course of hounding." The third and fourth assignments of error are overruled.

### Fifth Assignment of Error

{¶ 53} "The trial court erred in denying the Beacon's motions for directed verdict and/or judgment notwithstanding the verdict on appellees' punitive damages claims."

### Sixth Assignment of Error

{¶ 54} "The jury's verdicts in favor of appellees on their punitive damages claims and the judgment entered thereon were against the manifest weight of the evidence."

{¶ 55} We will address these assignments of error together because they are closely related. Beacon Journal contends that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on the Irvines' claims for punitive damages. Beacon Journal also contends that the punitive damage awards were against the manifest weight of the evidence.

{¶ 56} The trial court instructed the jury that it could award punitive damages if it found that Beacon Journal acted with actual malice. The trial court defined "actual malice" as "a state of mind characterized by hatred, ill will, or a spirit of revenge or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Beacon Journal contends that there was no evidence that it acted with actual malice.

{¶ 57} Although there is no evidence that Beacon Journal acted with hatred or ill will, there is ample evidence that it acted in conscious disregard to the

rights of others and that its conduct had a great probability of causing substantial harm. Beacon Journal's telemarketing system was purportedly designed to maximize productivity while at the same time minimizing the intrusion caused by the phone calls. The jury could reasonably conclude, however, that Beacon Journal's actions during the summer of 1999 demonstrated an emphasis on productivity at the expense of the recipients of the calls. During this time, the autodialer computer system crashed repeatedly, yet there is no evidence that Beacon Journal took any steps at that time to protect recipients of calls from the disturbance caused by additional calls.[3] Instead, when the system crashed, the steps Beacon Journal took were to run the autodialer again so that it could regain the data it lost, calling many telephone numbers again and again.

{¶ 58} Even if the jury focused only on the late-night phone calls, the evidence supported the jury's apparent conclusion that Beacon Journal's actions had a great probability of causing substantial harm. Beacon Journal limits its argument to the harm caused to the Irvines, overlooking the fact that the Irvines' telephone number was not the only one called by Beacon Journal during prohibited hours those two nights. The focus of punitive damages is on the defendant's conduct and whether it acted in conscious disregard to others, not just the particular plaintiffs in this case. See *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.

{¶ 59} There was no evidence of exactly how many calls were placed by the autodialer when it ran the disconnect list those two nights. There was evidence, however, that during a regular four-hour sales shift, the autodialer would place approximately five thousand calls and that it took several hours for Beacon Journal to run its disconnect list every weekend. The purpose of running the list was to generate a solicitation list. Witnesses from Beacon Journal's telemarketing department explained that the "fastest and best way for [it] to find new movers in the marketplace is to call through [a] disconnect list * * * and find newly activated telephone numbers that [it] can, at a later time, call for subscription sales." The resulting data were a list of hot prospects that Beacon Journal would target heavily for the first few weeks after the number was connected. When the system crashed in late June 1999 and Beacon lost data about the newly connected numbers, it was not willing to wait until the next weekend to regather information about these numbers. Although there was no direct evidence of how many newly connected numbers Beacon Journal expected to find when it ran its disconnect list, the jury could reasonably infer from the evidence that Beacon Journal expected the number to be significant.

---

3. Beacon Journal apparently replaced the system at a later time.

{¶ 60} Beacon Journal repeatedly suggests that because there was no sales pitch, but merely the brief ringing of the phone, these calls caused no real intrusion. Although the intrusion of a hang-up call apparently seems minimal to Beacon Journal, many of these hang-up calls came in the middle of the night, potentially waking people from a sound sleep. The recipient of a late-night hang-up call would typically assume that the caller is attempting to harass him or to determine whether anyone is at home. He would not likely conclude that the calls were coming from an autodialer in a telemarketing department that had been experiencing computer glitches.

{¶ 61} Middle-of-the-night hang-up calls would be disturbing to anyone, but Beacon Journal apparently did not even factor that consideration into its decision-making process. Beacon's staff set the machine to run all night, everyone went home, and when they came back the next day the data were waiting for them. The evidence further demonstrated that no one even bothered to review the data because no one saw a need. A review of these data would have shown that the autodialer detected a ring on the Irvines' line on June 27, yet it called that number on the disconnect list several more times, including the three calls in the middle of the night. It was apparently not until this litigation that Beacon Journal saw the need to review its data and discovered that the Irvines' number, and the jury could reasonably infer many other telephone numbers, were called on the disconnect list far more than the one time that should have been required to detect that the number had been reconnected.

{¶ 62} The jury could reasonably conclude that Beacon Journal had acted in conscious disregard to the rights of others and that its conduct had a great probability of causing substantial harm. Therefore, Beacon Journal has failed to demonstrate that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict or that the jury lost its way on the Irvines' claims for punitive damages. The fifth and sixth assignments of error are overruled.

### Seventh Assignment of Error

{¶ 63} "The jury's verdicts in favor of appellees on their claims for punitive damages and the judgments entered thereon are excessive and/or unconstitutional under Ohio and federal law."

{¶ 64} In addition to its claim that the punitive damage awards were not supported by the evidence, Beacon Journal raises a legal challenge to those awards. Beacon Journal's legal argument challenges the large disparity between the punitive damage award ($100,000) and the compensatory damage award ($250). Beacon Journal contends that each punitive damage award that was 400 times each compensatory damage award was, on its face, impermissible. In

support of this argument, Beacon Journal cites *Gray v. Gen. Motors Corp.* (1977), 52 Ohio App.2d 348, 359, 6 O.O.3d 396, 370 N.E.2d 747, in which the court found a punitive damage award that was also 400 times the compensatory damage award to be grossly disproportionate and, therefore, impermissible. The *Gray* court, however, did not find the punitive damages to be excessive solely based on the numbers. The court did not apply a "rigid mathematical formula" but instead looked at the evidence of wrongdoing that was before the jury. The *Gray* court stressed that punitive damages "must bear some reasonable relation or proportion to actual damages, that is, the nature and extent of the wrong done the plaintiff." Id. The court focused not only on the disparity between the punitive damages and the compensatory damages, but also on the fact that there was no direct evidence that the defendant had acted with actual malice. Id.

{¶ 65} " 'Low compensatory damages and high punitive damages assessed by a jury are not in and of themselves cause to reverse the judgment or to grant a remittitur, since it is the function of the jury to assess the damages and, generally, it is not for the trial or appellate court to substitute its judgment for that of the trier of fact. A large disparity, standing alone, is insufficient to justify a court's interference with the province of the jury.' " *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 438, 715 N.E.2d 546, quoting *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464.

{¶ 66} A large disparity, in and of itself, does not constitute reversible error because an award of punitive damages is more about a defendant's behavior than the plaintiff's loss. "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331. The actual damage sustained by the plaintiff "has little to do with how a jury might effectively and fairly punish and deter [the defendant's tortious conduct]." *Wightman*, 86 Ohio St.3d at 439, 715 N.E.2d 546. Factors that might make a large punitive damage award appropriate in a particular case include "[a] substantial harm, a continuing risk, a deterrent effect, and an economically viable [defendant]." Id.

{¶ 67} Thus, Beacon Journal's legal argument essentially becomes a factual one. Beacon Journal did not articulate a factual argument under this assigned error, however, and this court is not inclined to make Beacon Journal's argument for it. Consequently, the seventh assignment of error is overruled.

## Eighth Assignment of Error

{¶ 68} "The trial court erred in denying appellants' motion for directed verdict on plaintiffs' claims under the Telephone Consumer Protection Act."

{¶ 69} Beacon Journal contends that the trial court should have granted it a directed verdict on the Irvines' claims under the Telephone Consumer

Protection Act. It contends that the undisputed evidence demonstrated that the only calls placed during restricted hours did not qualify as "telephone solicitations" under the Act because the calls were placed by an automated dialing machine, and no solicitor was even intending to speak to the Irvines. This argument is not persuasive.

{¶ 70} Beacon Journal does not dispute that its telemarketing department placed the calls and that if the calls qualified as "telephone solicitations," they constituted violations of the Telephone Consumer Protection Act because the calls were placed between the restricted hours of 9:00 p.m. and 8:00 a.m. Their argument is that these calls did not constitute telephone solicitations because no sales representative was on the other end of the line; in fact, no sales representatives were even in the building at the time the calls were placed.

{¶ 71} Section 227(a)(3), Title 47, U.S.Code defines the term "telephone solicitation" as "the initiation of a telephone call * * * for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" Beacon essentially contends that a telephone call does not qualify as a "telephone solicitation" unless a sales representative is on the other end of the line, intending to speak to the recipient of the call.

{¶ 72} Beacon Journal cites no legal authority to support its argument, nor does it point to specific language of the definition that supports such a construction. There is no language in the statute requiring that a conversation take place or that a sales representative be at the other end of the line. As the Irvines argued in opposition to Beacon Journal's motion for directed verdict, the mere ringing of the phone could constitute a violation.

{¶ 73} Section 227(a)(3), Title 47, U.S.Code, as quoted above, refers to the "initiation" of a telephone call, not the completion of one. Expressions of legislative intent further support the trial court's construction of the statute. The Congressional findings following Section 227(a)(3), Title 47, U.S.Code stress the need to control the invasion into the privacy of the homes of consumers by telemarketers. The findings make repeated references to the low-cost technology of "automated or prerecorded telephone calls," suggesting that, if left unchecked, consumers could become overwhelmed by such calls. Legislative concern is directed toward the telephone calls themselves, noting that multimillions of such calls are placed each day, and that each time a telephone line is tied up with a call, it is "seized" for the duration of the call.

{¶ 74} The fact that no solicitor was at the other end of the line each time that Beacon Journal called the Irvines in the middle of the night does not demonstrate to this court that no reasonable fact finder could have found that the calls were placed for the purpose of encouraging the sale of a Beacon Journal subscription. Even if Beacon Journal did not intend to make a solicitation at

those particular times, Beacon Journal's own evidence was that the purpose of these calls was to detect recently connected telephone numbers so that it could generate a telemarketing list of numbers to be called by telemarketers in the future. The fact that these particular calls were one step removed from the actual sales pitch does not mean that the purpose of the calls was not to, ultimately, attempt to sell a subscription to the Beacon Journal. This court is not persuaded by Beacon Journal's argument that the calls it generated by the autodialer, with no intention of connecting them to a telephone solicitor, did not qualify as "telephone solicitations." Whether a solicitor is at the other end of the phone or not, when the telephone rings, the intrusion into the home and the seizing of the telephone line is the same. In fact, an argument can be made that when the telephone rings and no one is on the other end, the recipient is even more disturbed and inconvenienced than if a sales person is at the other end of the line.

{¶ 75} The eighth assignment of error is overruled.

### Ninth Assignment of Error

{¶ 76} "The jury's verdict in favor of appellees on their claims under the Telephone Consumer Protection Act is against the manifest weight of the evidence."

{¶ 77} Beacon Journal contends that the judgment for the Irvines on their claims under the Telephone Consumer Protection Act was against the manifest weight of the evidence. Beacon Journal does not dispute that it placed three calls to the Irvines' telephone number via the autodialer during restricted hours. Its weight-of-the-evidence argument is essentially the same as the argument it raised through its eighth assignment of error, that such calls did not constitute violations of the federal Act. Because this court found no merit in that argument, the ninth assignment of error is likewise overruled.

### Tenth Assignment of Error

{¶ 78} "The trial court abused its discretion and erred as a matter of law in submitting the question of entitlement to treble damages under the TCPA to the jury."

{¶ 79} Beacon Journal contends that the trial court erred in allowing the jury to determine whether the Irvines were entitled to treble damages because that issue should have been decided by the trial judge. Section 227(c)(5), Title 47, U.S.Code provides:

{¶ 80} "If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."

{¶ 81} Because the statute refers to the "court" rather than the jury, Beacon Journal contends that it requires that the treble damage issue be tried to the trial judge, not the jury. Beacon Journal cites no case law interpreting this provision on the issue, nor was this court able to find any.

{¶ 82} Although the term "court" might reasonably be interpreted to mean judge and not jury, see *Feltner v. Columbia Pictures Television, Inc.* (1998), 523 U.S. 340, 346, 118 S.Ct. 1279, 140 L.Ed.2d 438, it could also be construed to include the judge and jury. See *Feltner*, 523 U.S. at 356, 118 S.Ct. 1279, 140 L.Ed.2d 438 (Scalia, J., concurring in judgment). Even if "court" means trial judge, the statute merely fails to afford plaintiffs a statutory "right" to a jury trial. See id. at 346, 118 S.Ct. 1279, 140 L.Ed.2d 438. It does not mandate that the treble-damage issue be determined by the "court" without the assistance of the jury. Moreover, the United States Supreme Court's decision in *Feltner* suggests that, even if the Irvines had no statutory right to a jury determination of this issue, they may have had a constitutional one. See id. at 355, 118 S.Ct. 1279, 140 L.Ed.2d 438.

{¶ 83} The only case cited by Beacon Journal is one construing an entirely different statute, Ohio's Consumer Sales Practices Act, R.C. 1345.09(B). R.C. 1345.09 has no similar language referring to the "court," nor is the trebling of damages conditioned on a knowing or willful violation of the statute; the only similarity is the trebling of damages. Although courts have held that the trial judge, not the jury, is better equipped to determine a plaintiff's entitlement to treble damages under R.C. 1345.09, it is because the determination is a legal one, not a factual one, and legal determinations are within the province of the trial judge. See, e.g., *Inserra v. J.E.M. Bldg. Corp.* (Nov. 22, 2000), 9th Dist. No. 2973–M, at 17, 2000 WL 1729480. The determination of a plaintiff's entitlement to treble damages under the Telephone Consumer Protection Act, on the other hand, requires a mere factual finding, whether the defendant's violation was willful and knowing. See Section 227(c)(5), Title 47, U.S.Code. Thus, the reasoning expressed in *Inserra* does not apply.

{¶ 84} Consequently, Beacon Journal has failed to convince us that the trial court erred by allowing the jury to determine whether the Irvines were entitled to treble damages. The tenth assignment of error is overruled.

## Eleventh Assignment of Error

{¶ 85} "The trial court erred in failing to direct a verdict in favor of the Beacon on the issue of treble damages."

## Twelfth Assignment of Error

{¶ 86} "The award of treble damages is against the manifest weight of the evidence."

{¶ 87}   Beacon Journal contends that the trial court erred in failing to direct a verdict on the Irvines' claims for treble damages and that the treble-damage awards were against the manifest weight of the evidence.[4]   Beacon Journal maintains that there was no evidence to establish the statutory requirements for treble damages.

{¶ 88}   Section 227(c)(5), Title 47, U.S.Code allows the trial court to award treble damages if "the defendant willfully or knowingly violated the regulations prescribed under this subsection[.]" Beacon Journal contends that the evidence established that Beacon Journal did not know that it was violating the Telephone Consumer Protection Act by running its autodialer all night.   Based on the same legal reasoning asserted in its eighth assignment of error, that these calls did not constitute "telephone solicitations" under the Act, Beacon's witnesses testified that they did not know that they were violating the Act by running the disconnect list overnight.

{¶ 89}   Even if the jury believed the testimony of Beacon's witnesses that Beacon Journal did not knowingly violate the Act, the act also permitted an award of treble damages if Beacon Journal willfully violated the Act.   Although this court found no case law construing the "willfully * * * violated" language in the Telephone Consumer Protection Act, there is a wealth of case law construing the term "willful violation" as it is used in other federal statutes.

{¶ 90}   The United States Supreme Court, construing "willful violation" as that term is used in the Age Discrimination in Employment Act, held that an employer commits a "willful violation" of that Act when it demonstrates a knowing or reckless disregard for the matter of whether its conduct was prohibited by the act.   *Trans World Airlines, Inc. v. Thurston* (1985), 469 U.S. 111, 128, 105 S.Ct. 613, 83 L.Ed.2d 523.   The *Thurston* court further reasoned that a violation is not willful where the employer "acted reasonably and in good faith in attempting to determine whether [its conduct] would violate [the Act]." Id. at 129, 105 S.Ct. 613, 83 L.Ed.2d 523.

{¶ 91}   The evidence was clear that Beacon Journal telemarketing people knew about the federal Act and that they could not make solicitation calls after 9:00 p.m. or before 8:00 a.m. There was also evidence from which the jury could infer that Beacon Journal also knew or acted in reckless disregard of whether the

---

4.   Because Beacon Journal raised no motion for a directed verdict on this basis, this court can only assume that Beacon Journal faults the trial court for failing to sua sponte grant a directed verdict on the treble-damages issue.   See *Gibbons v. Price* (1986), 33 Ohio App.3d 4, 12, 514 N.E.2d 127.

Act also restricted when it could run the disconnect list. Beacon Journal did not normally run the disconnect list at night, but typically ran the list during daytime hours on Saturdays and Sundays. In fact, Beacon Journal's former consumer marketing manager testified that it was against company policy to run the disconnect list overnight.

{¶ 92} Beacon Journal's former circulation sales manager testified that he came in to work one Monday morning in late June 1999 and discovered that no data had been compiled on the disconnect list over the weekend. He decided to get the missing data by running the disconnect list overnight for two nights. He sought no opinion from Beacon's legal department or outside counsel, nor did he make any other attempt to determine whether that activity would comply with the Telephone Consumer Protection Act. In fact, he admitted that he made the decision himself and that he told no one about it except the night-shift leader. The night-shift leader ran the disconnect list on two nights, as he had been instructed to do, but he admitted that he was uncomfortable doing it.

{¶ 93} Reasonable minds could conclude, and the jury did not lose its way in so concluding, that Beacon Journal demonstrated a reckless disregard for whether its conduct of running the disconnect list overnight violated the Telephone Consumer Protection Act. The eleventh and twelfth assignments of error are overruled.

### Thirteenth Assignment of Error

{¶ 94} "The award of treble damages must be vacated and/or reduced because appellees are not entitled to recover damages in excess of three times the amount available under the statute."

{¶ 95} For Beacon Journal's violations of the Telephone Consumer Protection Act, the jury found that the Irvines were entitled to total statutory damages of $1,500 plus treble damages of $4,500. The trial court then entered judgment that awarded the Irvines both the statutory damages and the treble damages. Beacon Journal contends that, by the explicit terms of the Telephone Consumer Protection Act, and legal principles governing the trebling of damages generally, the trial court had authority to award the trebled damages in lieu of the statutory damages, but not in addition to them. We agree.

{¶ 96} As quoted above, Section 227(c)(5), Title 47, U.S.Code provides:

{¶ 97} "If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."

{¶ 98} The explicit terms of the statute authorize the trial court to increase the statutory damages to an amount "equal to not more than 3 times" the

statutory damages. Nothing authorizes the trial court to award treble damages in addition to the statutory damage award. The total damages cannot exceed the trebled amount.

{¶ 99} The concept of trebled damages generally has always been understood to authorize the trebling of damages as a total damage figure, not one to be added to the statutory or compensatory damages. See, e.g., *Green v. U.S.A. Energy Consultants* (Sept. 18, 1986), 8th Dist. Nos. 50942 and 51149, 1986 WL 11053. The trial court erred by awarding treble damages in addition to the statutory damages, rather than in lieu of them. The thirteenth assignment of error is sustained.

## Fourteenth Assignment of Error

{¶ 100} "The trial court erred in entertaining appellee's motion for attorney fees, in adopting the magistrate's findings of fact and conclusions of law concerning attorney fees, and in entering judgment awarding attorney fees in favor of appellees."

{¶ 101} Beacon Journal contends that the trial court erred in awarding attorney fees to the Irvines because the jury, not the court, should have made the determination of whether the Irvines were entitled to attorney fees. We need not address the propriety of the attorney fee award because Beacon Journal has failed to preserve this issue for review.

{¶ 102} First, as the trial court noted in a post-trial order, the trial court had informed the parties that it would address the issue of attorney fees after trial and neither party raised any objection. Moreover, the issue of attorney fees was tried to a magistrate, who decided that the Irvines should be awarded $60,485.25 in attorney fees. Although Beacon Journal raised several objections to the magistrate's decision, it did not object to the fact that the attorney fee issue was tried to the magistrate and not a jury. Civ.R. 53(E)(3)(b) expressly states that "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule." Because Beacon Journal did not raise an objection on this basis, we are precluded from addressing the merits of this assignment of error, and it is overruled accordingly. See *In re Estate of Kordiac* (Oct. 20, 1999), 9th Dist. No. 19192, at 3, 1999 WL 975105. The fourteenth assignment of error is overruled.

## Cross-Assignment of Error

{¶ 103} "The trial court erred in relieving its garnishment order and in not requiring the appellant to post a bond in the amount [of] the jury verdict while the case is pending in [the] appellate court."

{¶ 104} The Irvines contend that the trial court erred: (1) by vacating its prior order of garnishment and (2) by staying the execution of the judgment without requiring it to post a supersedeas bond.

{¶ 105} Although no order of garnishment appears in the record, the trial court indicated through a subsequent journal entry that it was vacating its prior order of garnishment. The Irvines contend that the trial court has no authority to vacate an order of garnishment, but they cite no authority for that proposition. We are not inclined to make the Irvines' legal argument for them. *Collier v. Dorcik* (Nov. 29, 2000), 9th Dist. No. 3009–M, at 13, 2000 WL 1751301. Moreover, as Beacon Journal notes, the trial court ordered garnishment before the judgment was final, so its act of vacating that order appears to be appropriate. See *State ex rel. Electrolert, Inc. v. Lindeman* (1994), 99 Ohio App.3d 154, 157–158, 650 N.E.2d 137.

{¶ 106} The Irvines next contend, relying on Civ.R. 62(B), that the trial court had no authority to stay the execution of the judgment without ordering Beacon Journal to pay a supersedeas bond. Civ.R. 62(B) provides:

{¶ 107} "When an appeal is taken the appellant may obtain a stay of execution of a judgment or any proceedings to enforce a judgment by giving an adequate supersedeas bond. * * * The stay is effective when the supersedeas bond is approved by the court."

{¶ 108} The Irvines cite no authority that construes Civ.R. 62(B) as mandating a bond before a stay can be granted. An "adequate supersedeas bond" could reasonably be construed to mean no bond at all, if the trial court felt that none was necessary, as in this case. See *Lomas & Nettleton Co. v. Warren* (June 29, 1990), 11th Dist. No. 89–G–1519, 1990 WL 93138 (construing "sufficient sureties" language of R.C. 2505.09 to encompass no sureties in certain cases).[5] This court has held that "under appropriate circumstances, the trial court may exercise its discretion and stay the execution of judgment without requiring the appellant to post a supersedeas bond." *Whitlatch & Co. v. Stern* (Aug. 19, 1992), 9th Dist. No. 15345, at 21, 1992 WL 205071; see, also, *Lomas,* supra (holding that "[t]he posting of a supersedeas bond is not mandatory to stay an execution in all cases").

{¶ 109} The trial court gave a reasonable explanation for its decision that an "adequate" bond to secure the Irvines' interests in this case was no bond at all. In its journal entry granting the stay, the trial court indicated its finding "that the Plaintiffs are adequately secured by the Defendant's solvency and well-established ties to Akron, Ohio and that, therefore, the Defendants are not

---

5. The Irvines do not base their argument on R.C. 2505.09.

required to post a bond at this time." This court finds no abuse of discretion by the trial court. The cross-assignment of error is overruled.

### III

{¶ 110} Beacon Journal's thirteenth assignment of error is sustained. Its remaining assignments of error are overruled. The Irvines' cross-assignment of error is overruled. The judgment is reversed only insofar as the trial court awarded treble damages in addition to statutory damages under the Telephone Consumer Protection Act. The cause is remanded for correction of that aspect of the judgment only.

Judgment affirmed in part,
reversed in part
and cause remanded.

SLABY and CARR, JJ., concur.