121 P.3d 831

Rodney L. JOFFE, Plaintiff–Appellee,

v.

ACACIA MORTGAGE CORPORATION, an Arizona corporation, f/k/a Acacia National Mortgage Corporation, an Arizona corporation, Defendant–Appellant.

No. 1 CA–CV 02–0701.

Court of Appeals of Arizona, Division 1, Department E.

Sept. 20, 2005.

Osborn Maledon, P.A. By Thomas L. Hudson and Daniel L. Kaplan, Phoenix, Attorneys for Defendant–Appellant.

Rudner Law Offices By Steven M. Rudner and John C. Josefsberg, Dallas, TX, Attorneys for Plaintiff–Appellee.

## OPINION

NORRIS, Judge.

¶1 Acacia Mortgage Corporation ("Acacia") appeals from the superior court's order granting what was in effect partial summary judgment in favor of Rodney Joffe. The superior court found Acacia had violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227 (Supp.2005),[1] by

---

1. We cite to the current version of the applicable statutes if no revisions material to the decision have occurred.

delivering unsolicited advertisements, in the form of text messages, to Joffe's cellular telephone. Acacia argues the superior court should not have ruled against it because the TCPA does not apply to text messages, and if it does, the TCPA violated its rights under the First Amendment. For the following reasons, we affirm the superior court's order and hold the TCPA applies to the text messages at issue here and does not violate Acacia's First Amendment rights.

## BACKGROUND AND PROCEDURAL HISTORY

¶ 2 On January 6, 2001, Joffe's cellular telephone rang. When he answered it, he discovered he had received an unrequested text message solicitation from Acacia, a mortgage company. The message stated, "[C]arla, Greenspan lowered rates, 30 yr mortgage=6.875%. Still interested? 602–944–7200 or www.AcaciaNatio nal.com[.]" On March 21, 2001, Joffe received a second text solicitation from Acacia on his cellular telephone. In similar form, this message stated, "Mr. Simms, Federal Reserve just cut rates by 1/2%. Still want new mortgage? 480–897–8944 . . . ."

¶ 3 Acacia's messages to Joffe were part of a marketing campaign to advertize low interest rates on home mortgages. Acacia programmed its computers to send the solicitations as electronic mail messages ("e-mail") over the Internet to consumer e-mail addresses. In Joffe's case, Acacia's computers generated his cellular telephone number, "(602)XXX–XXXX," [2] plus his cellular telephone carrier's domain name, "att.net," and sent the solicitations to the e-mail address 602XXXXXXX@att.net.

¶ 4 When Acacia's e-mails reached Joffe's cellular carrier's domain, his carrier automatically converted the text, that is, the content of the solicitations, into a format that could be transmitted to Joffe's cellular telephone number. Acacia was thus able to take advantage of a service provided to Joffe by his cellular telephone carrier known as Short Message Service ("SMS"). As discussed in more detail below, SMS allows cellular telephone subscribers to send and receive text messages, known as SMS messages, on their cellular telephones.

¶ 5 On April 26, 2001, Joffe filed a complaint in justice court alleging Acacia had violated the TCPA's prohibition on using "any automatic dialing system" to make "any call" to "any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Acacia answered the complaint and filed a counterclaim requesting $55,000 in damages for "harassment." Because the amount sought by Acacia in its counterclaim exceeded the jurisdiction of the justice court, the case was transferred to superior court. After the transfer, Acacia moved for summary judgment arguing the TCPA was inapplicable because it had simply sent Joffe e-mails. The superior court denied the motion:

> By using an e-mail address composed primarily of a telephone number, [Acacia] initiated a telephone message to a telephone number assigned to a cellular telephone service. By this method, [Acacia] initiated a demand to make a connection to [Joffe's] cellular telephone for the purpose of delivering a message by telephone encouraging the purchase of services or investment in a product offered by [Acacia]. By doing advertising in this manner, [Acacia] shifted some of the cost of its advertising to those receiving the telephone calls. The Court is of the opinion that such conduct violates the [TCPA].

¶ 6 Following the superior court's ruling, Joffe moved to certify the case as a class action, alleging Acacia had sent the same promotional messages to 90,000 cellular telephones using the same method of transmission and form of e-mail address. Thereafter, Acacia filed a second "motion for summary judgment or, in the alternative, motion for reconsideration," and argued the TCPA was directed at telephone calls that involved two-way voice communications and not at the sending of text messages. In response, Joffe filed a cross-motion for summary judgment

---

2. For privacy reasons, we have deleted the last seven digits of Joffe's cellular telephone number.

and asked the superior court to grant summary judgment one way or the other on the issue of Acacia's liability under the TCPA.

¶ 7 Relying on its prior ruling, the court granted what was in effect partial summary judgment in favor of Joffe and held Acacia liable under the TCPA. The court also rejected Acacia's argument the TCPA violated its rights under the First Amendment to the United States Constitution.

¶ 8 Acacia timely appealed. As a consequence of the appeal, the superior court took no action on the motion to certify the class. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(G) (2003).[3]

## DISCUSSION

■ ¶ 9 Whether the TCPA applies to Acacia's actions turns on the wording of 47 U.S.C. § 227(b)(1)(A)(iii) and the resolution of two issues: first, whether Acacia called Joffe, and, second, if it did, whether Acacia used an "automatic dialing system" to do so.[4] For the following reasons, we hold Acacia called Joffe using an automatic dialing system. Consequently, we agree with the superior court that Acacia violated the TCPA.

### I. The TCPA

¶ 10 Enacted in 1991 as an amendment to the Communications Act of 1934, the TCPA was designed to deal with various telemarketing practices arising out of the telemarketing industry's use of sophisticated equipment, generically known as autodialers, to generate millions of automated telephone calls to residential and business telephone subscribers. S.Rep. No. 102–178, at 2–3 (1991), as reprint-

ed in 1991 U.S.C.C.A.N.1968, 1969–71. Congress found consumers and businesses were especially frustrated by these calls, viewing them as a nuisance, an invasion of privacy and a threat to interstate commerce. Id. at 1; Telephone Consumer Protection Act of 1991, Pub.L. No. 102–243, § 2, 105 Stat. 2394 (1991) (current version at 47 U.S.C. § 227). Accordingly, as relevant here, the TCPA prohibits "any call" using "any automatic dialing telephone system" to "any telephone number assigned to a . . . cellular telephone service." Section 227(b)(1)(A)(iii) reads as follows:

> It shall be unlawful for any person within the United States . . .
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> . . .
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

¶ 11 Congress delegated authority to the Federal Communications Commission ("FCC") to promulgate regulations implementing the TCPA's requirements. 47 U.S.C. § 227(b)(2). The FCC's regulation implementing § 227(b)(1)(A)(iii) states:

> No person . . . may:(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing sys-

---

3. On April 15, 2003, relying on our opinion in *Mezey v. Fioramonti,* 204 Ariz. 599, 65 P.3d 980 (App.2003), *overruled by Bilke v. State,* 206 Ariz. 462, 80 P.3d 269 (2003), this court dismissed Acacia's appeal as an improper interlocutory appeal. On February 13, 2004, the Arizona Supreme Court remanded the case to this court for reconsideration in light of *Bilke,* 206 Ariz. at 465, ¶ 12, 80 P.3d at 272 (A.R.S. § 12–2101(G) allows appeals from interlocutory judgments when only remaining issue determines amount of recovery). We determined the superior court's order granting partial summary judgment complied with the requirements set out in *Bilke* for an interlocutory appeal. Accordingly, on August 3, 2004, we va-

cated our April 15, 2003 order and scheduled briefing.

4. We review a superior court's decision granting summary judgment de novo. *Great Am. Mortgage v. Statewide Ins. Co.,* 189 Ariz. 123, 125, 938 P.2d 1124, 1126 (App.1997). When, as here, the parties do not dispute the material facts, we must determine whether the trial court correctly applied the law to those facts. *Walgreen Ariz. Drug Co. v. Ariz. Dep't of Rev.,* 209 Ariz. 71, 72, ¶ 6, 97 P.3d 896, 897 (App.2004). Matters of statutory interpretation are issues of law we review de novo. *Id.*

tem or an artificial or prerecorded voice ... (iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47 C.F.R. § 64.1200 (2004).

### A. Acacia Called Joffe

¶ 12 The TCPA does not define the word "call." Stating the word call should be given its ordinary meaning, Acacia argues the TCPA only regulates what it describes as ordinary telephone calls—calls that present the potential for two-way real time voice "intercommunication," that is, "a connection that allows two people to speak to each other in 'real time' as though they were face-to-face." Under Acacia's description of a call, it did not call Joffe because, first, its text messages lacked the foregoing characteristics of a traditional telephone call, and second, it simply sent e-mail to an e-mail address.

¶ 13 To decide what Congress intended when it used the word call, we apply familiar rules of statutory construction. We begin with the language of the TCPA and interpret its words "as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).[5]

¶ 14 Viewed in isolation, the word call has many plain and ordinary meanings. *See generally* Webster's Third New Int'l Dictionary Unabridged 317–18 (1993); Webster's Ninth New Collegiate Dictionary 197 (1990); Random House College Dictionary 192 (1988). Call can be used as both a verb and a noun. As a verb "call" can mean "to command or request ... to come or be present." Webster's Third at 318; Random House College at 192. It can also mean to utter or cry out in a loud voice. Webster's Third at 318; Random House College at 192. Call can also

mean "to criticize adversely" as in "she called him on his vulgar language." Webster's Encyclopedic Unabridged Dictionary 211 (1989). As a noun, "call" similarly has multiple meanings. For example, "the cry or vocal sound of a bird or other animal," or "a short visit." Random House Unabridged Dictionary 297 (2nd ed.1993).

¶ 15 Of course, call is also commonly associated with telephone use. In that context, when the word call is used as a verb, one if its most common meanings is to communicate or try to communicate with by telephone. *E.g.*, Webster's Third at 318 ("to communicate with or try to get into communication with a person by telephone"); Random House Unabridged at 297 ("to communicate or try to communicate with by telephone"); Random House Webster's College Dictionary 194 (1991) ("to communicate or try to communicate with by telephone"). And when used as a noun in that context, it often refers to the act or instance of calling on the telephone. Random House Unabridged at 297; Webster's Third at 318. In our view, given that the TCPA was designed to regulate the receipt of automated telephone calls, Congress used the word call to refer to an attempt to communicate by telephone. *See United States v. Amer. Trucking Assoc.*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (when words of a statute are susceptible to more than one meaning, courts are to interpret them in a matter which is reasonable given the subject matter of the statute and its purpose).

¶ 16 The TCPA does not limit the attempt to communicate by telephone to two-way real time voice "intercommunication," as Acacia argues. As relevant here, the TCPA states it "shall be unlawful for any person ... *to make any call* ... using an automatic telephone dialing system ... to any telephone

---

5. We apply the same rules of statutory construction in determining the meaning of state statutes. *See Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 206 Ariz. 1, 5, ¶ 10, 75 P.3d 91, 95 (2003) (citing *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996))("[W]e first look to the language of the statute itself. Our chief goal is to ascertain and give effect to the legislative intent."); *Calik*

*v. Kongable*, 195 Ariz. 496, 498, ¶ 10, 990 P.2d 1055, 1057 (1999) (if statute is unambiguous we apply language without using other means of statutory construction); *Logan v. Forever Living Prods. Int'l, Inc.*, 203 Ariz. 191, 194, ¶ 10, 52 P.3d 760, 763 (2002)(when "plain language" analysis is insufficient to determine legislative intent we look to statute's policy or evil it was designed to address).

number assigned to a ... cellular telephone service...." 47 U.S.C. § 227(b)(1)(A)(iii)(emphasis added). It is the act of making a call, that is, of attempting to communicate to a cellular telephone number using certain equipment, that the TCPA prohibits. Whether the call had the potential for a two-way real time voice communication is irrelevant. Accordingly, we hold an attempt to communicate by telephone constitutes a call under the TCPA even if the attempted communication does not present the potential for two-way real time voice intercommunication.

¶ 17 Our conclusion that the word call is not restricted to the type of call described by Acacia is consistent with other language in the TCPA provisions at issue here. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) ("[T]he meaning of statutory language, plain or not, depends on context."). In addition to prohibiting calls by automatic dialing systems, the TCPA also prohibits any call using any artificial or prerecorded voice to a telephone number assigned to a cellular telephone service, or to a residential telephone line. 47 U.S.C. § 227(b)(1)(A)(iii),(b)(1)(B). A call made by an artificial or prerecorded voice has no potential for a real time voice intercommunication.

¶ 18 Our construction of the word call is also supported by the TCPA's legislative history. The Senate Report accompanying the TCPA identified a litany of problems caused by the telemarketing industry's aggressive use of machines to make automated calls. S.Rep. No. 102–178, at 2. Congress viewed these calls as more of a nuisance and a greater invasion of privacy than calls placed by "live" people because, for example, automated calls failed to "respond to human voice commands to disconnect" or to "allow the caller to feel the frustration of the called party...." *Id.* at 2, 4. Thus, one of the central purposes of the legislation was to protect the public from automated calls—calls made by machines without the potential for real time voice "intercommunication."

¶ 19 The parties have not cited, nor have we been able to find, any case law interpreting the TCPA provisions at issue here. One court has, however, interpreted another TCPA provision as prohibiting telephone solicitations that did not involve the potential for a real time voice communication. *See Irvine v. Akron Beacon Journal,* 147 Ohio App.3d 428, 770 N.E.2d 1105 (2002). At issue in the *Irvine* case was 47 U.S.C. § 227(a)(3) of the TCPA, which defines the term "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of ... goods ... or services." *Id.* at 1118, ¶ 71.

¶ 20 In *Irvine,* the defendant used an autodialer to generate a telemarketing solicitation list. *Id.* at 1109, ¶ 8. The autodialer called numbers from a preprogrammed list of disconnected telephone numbers and, depending on the type of sound signal received, recorded which of the telephone numbers had been reconnected and were working. *Id.* As soon as the autodialer detected the sound signal, it recorded the information and dropped the call. *Id.* The defendant asserted the calls were not telephone solicitations under the TCPA because no solicitors were on the calls when they were placed. *Id.* at 1118, ¶ 70. The court rejected the argument, stating there was "no language in the statute requiring that a conversation take place...." *Id.* at ¶ 72. The court explained:

> This court is not persuaded by [defendant's] argument that the calls it generated by the autodialer, with no intention of connecting them to a telephone solicitor, did not qualify as "telephone solicitations." Whether a solicitor is at the other end of the phone or not, when the telephone rings, the intrusion into the home and the seizing of the telephone line is the same. In fact, an argument can be made that when the telephone rings and no one is on the other end, the recipient is even more disturbed and inconvenienced than if a sales person is at the other end of the line.

*Id.* at 1119, ¶ 74. We find the reasoning of *Irvine* persuasive. There is no language in the TCPA that restricts calls to only those that present the potential for a voice communication. The TCPA's provisions at issue here apply to any type of call, voice or text.

¶ 21 For these reasons, we hold that a call subject to § 227(b)(1)(A)(iii) of the TCPA

occurs when the caller has made an attempt to communicate by telephone, even if the attempt does not present the potential for a two-way voice intercommunication. A text message may constitute a call subject to the TCPA if the other requirements of the statute are met.[6]

¶ 22 We thus come to what is really at the heart of Acacia's argument—even if the term call is not restricted to voice intercommunications, it nevertheless did not call Joffe because it simply sent e-mail to an e-mail address—conduct the TCPA does not prohibit. Acacia's description of what it did, however, is incomplete. To understand what Acacia actually did, which is subject to the TCPA, and what it says it did, requires a description of the technology involved in the transmission of its solicitations to Joffe, technology it adopted for its own commercial purposes.

¶ 23 SMS is a messaging system that allows cellular telephone subscribers to send and receive short messages (hence, the name) usually limited to 160 or so characters on their cellular telephones. An SMS message is a text message "directed to [a] wireless devic[e] through the use of the telephone number assigned to the device." *Notice of Proposed Rule Making in re Regulations Implementing the CAN–SPAM Act of 2003 and the TCPA,* 19 FCC Rcd. 5056, 2004 WL 547587 (2004) ("CAN–SPAM NPRM").[7] An SMS message may be transmitted phone-to-phone and, as Acacia did here, Internet-to-phone. Many cellular telephone carriers provide their customers with SMS. *Implementation of Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993,* 17 FCC

Rcd. 12985, 13051–52, 2002 WL 1438562 (2002).

¶ 24 A phone-to-phone SMS message is, as its name suggests, a text message sent from one cellular telephone to another cellular telephone. The sender uses his cellular telephone to address a message to the recipient's cellular telephone number, and types the message on the cellular telephone's keypad. The text message then travels from the sending cellular telephone to the sender's carrier and then through the appropriate cellular telephone switch to the recipient's cellular telephone carrier who transfers it to the receiving cellular telephone. *See generally Heng Xu, Foundations of SMS Commerce Success; see also* CAN–SPAM NPRM, 19 FCC Rcd. at 5063, ¶ 15; 2003 TCPA Order, 18 FCC Rcd. at 14115 n. 606. The Internet is not involved when an SMS message is sent phone-to-phone. CAN–SPAM NPRM, 19 FCC Rcd. at 5063, ¶ 15.

¶ 25 The Internet becomes involved, however, when an SMS message is transmitted Internet-to-phone. *Id.* The text message is initially delivered over the Internet as an e-mail directed to an e-mail address assigned by a cellular telephone carrier to a subscriber. *Id.* When the e-mail reaches the e-mail address, it is converted automatically by the carrier into a different format that can be transmitted to the customer's cellular telephone. *Id.* To illustrate: assume cellular telephone carrier "Wireless" has assigned to its customer cellular telephone number (123)456–7890 and has also given its customer an e-mail address made up of the custom-

---

6. We note that in 2003, the FCC issued an order specifically stating the TCPA's prohibition on autodialed calls "encompasses both voice calls and text calls to wireless numbers including, for example short message service (SMS) calls...." *Rules and Regulations Implementing the TPCA, Report and Order,* 18 FCC Rcd. 14014, 14115, ¶ 165, 2003 WL 21517853 (2003)("2003 TCPA Order").

7. Throughout this opinion we have cited to notices and orders issued by the FCC concerning the TCPA and the CAN–SPAM Act that describe the technology involved in this case. The FCC's description of SMS, phone-to-phone SMS, and Internet-to-phone SMS is consistent with how this technology has been described in the marketplace. *See generally* Heng Xu, et al., *Founda-*

*tions of SMS Commerce Success: Lessons from SMS Messaging and Co-opetition,* §§ 2.1, 2.2.3, http://www.hi css. hawaii.edu/HICSS36 /HICSS-papers/DTM CC06.pdf (last visited Sept. 12, 2005); Institute of Electrical and Electronics Engineers, *SMS and MMS,* http://ewh.ieee .org/r10/bombay/ news6/ SMSAndMMS/SMS.htm (last visited Sept. 12, 2005); Telemetrix Inc., *GSM Network Access for your messaging needs,* http://www.tlxt. net/developer.html (last visited Sept. 12, 2005); Cingular, Text Messaging FAQs, http://www.cingular. com/media/ text_messaging_faqs (last visited Sept. 12, 2005); Verizon Wireless, *How to Use Guide: TXT messaging,* http://dts.vzw. com/pdf/HowTo_TXTmessaging.pdf (last visited Sept. 12, 2005).

er's cellular telephone number and Wireless' domain name, wireless.com. An e-mail sent to that e-mail address, 1234567890@wireless.com, will travel from the sender's computer over the Internet to Wireless' domain. After the e-mail arrives at Wireless' domain, pursuant to the particular SMS protocol used by Wireless, Wireless will automatically convert the text of the message into an SMS message and forward the SMS message to its customer's cellular telephone.[8] Thus, Wireless actually receives the e-mail, and after processing it, directs the message to its customer's cellular telephone as an SMS message. *See generally* T–Mobile comments in response to CAN–SPAM NPRM at 5–6 (April 30, 2004), http://gullfoss 2.fcc.gov/prod/ecfs/retrieve.cg i?native_or_pdf=pdf & id_document=6516182561 (last visited Sept. 12, 2005); Verizon Wireless comments in response to CAN–SPAM NPRM at 2–3 (April 30, 2004), http://gullfoss 2.fcc.gov/prod/ecfs/retrieve.cgi? native_or_pdf=pdf & id_document=6516182468 (last visited Sept. 12, 2005).[9]

¶ 26 Whether a text message is sent phone-to-phone or Internet-to-phone, the end result is the same. The recipient's cellular telephone carrier forwards what is an SMS message to the recipient's cellular telephone.

¶ 27 Here, Joffe received two SMS messages from Acacia. Acacia used its computers to generate the messages and direct them to an e-mail address provided to Joffe by his carrier that was made up of Joffe's ten digit cellular telephone number and his cellular carrier's domain name. When Acacia's

solicitations reached Joffe's carrier, it converted them into SMS messages and delivered them to Joffe's cellular telephone.

¶ 28 As is clear from the foregoing discussion, Acacia did not, as it contends, simply send e-mail to an e-mail address. Using its computers and the Internet, Acacia co-opted the SMS service offered by Joffe's carrier to deliver SMS text messages to Joffe by telephone. As the trial court correctly observed, Acacia "initiated a demand to make a connection ... for the purpose of delivering a message by telephone encouraging the purchase of services or investment in a product offered" by it. In so doing, Acacia attempted to communicate by telephone. Under the TCPA, Acacia called Joffe.

### B. Acacia Used an Automatic Dialing System to Call Joffe

¶ 29 Not every telemarketing call is subject to the TCPA. As relevant here, the TCPA is implicated only when the caller uses an automatic dialing system. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Acacia does not dispute its computers randomly or sequentially produced telephone numbers. Instead, it argues it did not contact Joffe by using equipment that called or dialed his cellular telephone number. The focus of its argument is that its computers simply sent e-mail to an e-mail address.[10]

---

**8.** In an interrogatory answer, Joffe described the Internet-to-phone delivery system as follows:

> The perception that a cellular phone can receive email is accomplished by the cellular phone's service provider performing an automated message translation. Stated simply, the content of the e-mail message is converted into a new message and format that the cellular telephone can understand, therefore the content of the message is delivered, but it can in no way be considered or construed as email. The provider's message center then directs the newly created message back out to the switch in the appropriate cell and the message is transmitted to the cellular telephone with the same conventions employed for all other cellular telephone communication.

Acacia did not dispute Joffe's description of Internet-to-phone SMS and, indeed, relied on his

description of it in moving for partial summary judgment.

**9.** Although an Internet-to-phone SMS message includes an Internet domain name at the point the sender transmits it over the Internet, the domain name is not used when the message is delivered by the carrier to its customer. This is because, once the message reaches the carrier, it converts the message into an SMS message (without the Internet domain) for forwarding to the customer's cellular telephone. T–Mobile comments in response to CAN–SPAM NPRM at 6.

**10.** The TCPA does not define the word dial. Dial has many plain and ordinary meanings. *E.g.,* Webster's Ninth Collegiate at 349; Random House College at 366. For example, "a device

¶ 30 But, as we have already discussed, Acacia did not simply send e-mail to an e-mail address. Acacia took advantage of a service offered by Joffe's carrier to reach Joffe's cellular telephone. Even though Acacia used an attenuated method to dial a cellular telephone number, it nevertheless did so.

¶ 31 Although the technology Acacia used to deliver the SMS messages to Joffe's cellular telephone may not have existed in 1991 when the TCPA was enacted, the wording of the statute is not limited to 1991 technology. Congress prohibited calls made using *"any* automatic telephone dialing *system."* (Emphasis added.) Congress described such a system in functional terms: "equipment which has the capacity—(A) to store or produce telephone numbers to be called . . . and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). This wording demonstrates Congress anticipated the TCPA would be applied to advances in automatic telephone dialing technology.

¶ 32 We are not alone in reaching this conclusion. In exercising its rulemaking authority under the TCPA, the FCC has reached the same conclusion. For example, in 2002, the FCC invited comment on whether new autodialing technologies could be included within the restrictions on automatic telephone dialing systems. *Notice of Proposed Rule Making in re Regulations Implementing the TCPA,* 17 FCC Rcd. 17459, 17473–74, ¶¶ 23–24, 2002 WL 31084939 (2002)("2002 TCPA Notice").[11] The FCC concluded the statutory definition of automatic dialing system included advances in technology: "[i]t is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." 2003 TCPA Order, 18 FCC Rcd. at 14092, ¶ 132.

¶ 33 As we have explained, Acacia took advantage of Internet-to-phone SMS technology—technology that guaranteed its computer generated text messages would be delivered to Joffe's cellular telephone. By pairing its computers with SMS technology, Acacia did what the TCPA prohibits. It used an automatic telephone dialing system to call a telephone number assigned to a cellular telephone.

## II. The CAN–SPAM Act

¶ 34 Despite the wording of the TCPA, Acacia argues the language, legislative history, and FCC implementation of the Controlling the Assault of Non–Solicited Pornography and Marketing Act of 2003 ("CAN–SPAM Act"), passed 12 years after the TCPA, demonstrate Congress intended the CAN–SPAM Act and not the TCPA to apply to the messages it sent to Joffe's cellular telephone. Pub.L. No. 108–187, 117 Stat. 2699 (2003), *codified at* 15 U.S.C. §§ 7701–7713, 18 U.S.C. § 1037 and 28 U.S.C. § 994 (Supp.2005). We disagree.

¶ 35 The CAN–SPAM Act, which became effective on January 1, 2004, was enacted to *protect consumers from unwanted commercial e-mail, known colloquially as "spam."* It imposes a number of restrictions on the sending of commercial e-mail, defined as messages that have as their primary purpose a commercial advertisement or a promotion of a commercial product or service. The CAN–SPAM Act also contains a section concerning unwanted messages to wireless devices, such as cellular telephones. Specifically, § 14(b), codified as 15 U.S.C. § 7712(b),

---

(as a disk) that may be operated to make electrical connections or to regulate the operation of a machine and that usu[ally] has guiding marks around its border," Webster's Ninth at 349, or "a rotatable plate or disk," Webster's Encyclopedic Unabridged Dictionary 397 (1989). In the context of the phrase "to dial such numbers" the words "to dial" mean to "operate" or "manipulate" a device "in order" to make or establish a telephone call or connection. Webster's Ninth at 349; Random House College at 366; Webster's Third at 622; The New Shorter Oxford English Dictionary 660 (1993).

11. In seeking such comment, the FCC recognized "that in the last decade new technologies have emerged to assist telemarketers in dialing the telephone numbers of potential customers. More sophisticated dialing systems, such as predictive dialers and other electronic hardware and software containing databases of telephone numbers, are now widely used by telemarketers to increase productivity and lower costs." 2002 TCPA Notice, 17 FCC Rcd. at 17474, ¶ 24.

directed the FCC to issue rules protecting consumers from "unwanted mobile service commercial messages," or "MSCMs." An MSCM is a "commercial electronic mail message that is transmitted directly to a wireless device that is utilized by a subscriber of commercial mobile service (as such term is defined in [47 U.S.C. § 332(d)(1) (2004) ][ [12] ] ) in connection with such service." 15 U.S.C. § 7712(d). The legislative history of the CAN–SPAM Act reflects § 14 was inserted into the statute to address unwanted text messages sent to wireless devices including cellular telephones. Indeed, certain members of the House described this section of the CAN–SPAM Act as being the "first step" toward prohibiting such messages. 140 Cong. Rec. H12193, H12194, and H1298 (daily ed. Nov. 21, 2003)(statements of Reps. Markey, Dingell, Holt). Neither § 14 nor these comments, however, demonstrate Congress intended the CAN–SPAM Act, and only the CAN–SPAM Act, to apply to unsolicited text messages.

¶ 36 First, Congress contemplated the CAN–SPAM Act and the TCPA could have dual applicability. Section 14(a) specifically states "[n]othing in this Act shall be interpreted to preclude or override the applicability of [the TCPA]...." 15 U.S.C. § 7712(a).

¶ 37 Second, although certain members of Congress may have thought the CAN–SPAM Act was the first legislation to attack unwanted text messages sent to wireless devices, their perceptions, stated years after the passage of the TCPA, fail to demonstrate the TCPA was inapplicable to the text messages Acacia delivered to Joffe. None of them mentioned the TCPA and none of them expressed any opinion about its applicability to text messages.

¶ 38 As the Supreme Court has repeatedly instructed, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *E.g., United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960). This is especially true when the subsequent legislative history consists of statements made by individual legislators as to what they believe the prior legislation meant.

> Such [subsequent] history does not bear strong indicia of reliability, however, because as time passes memories fade and a person's perception of his earlier intention may change. Thus, even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). This holds true even when a later Congress passes legislation to address actions it believes fall outside the scope of earlier legislation. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 349, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

¶ 39 We also do not agree, as Acacia suggests, that in adopting rules pursuant to § 14 of the CAN–SPAM Act, the FCC took the position the language of the TCPA is not broad enough to encompass Internet-to-phone SMS calls. As noted above, under the CAN–SPAM Act, an MSCM is a commercial electronic mail message "transmitted directly to a wireless device." After requesting and receiving public comment on how it should interpret and apply this language in its proposed rules,[13] the FCC concluded MSCMs

---

**12.** 47 U.S.C. § 332(d)(1) defines "commercial mobile service" as "any mobile service that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the [FCC]." The FCC interprets commercial mobile service to include wireless carriers. CAN–SPAM NPRM, 19 FCC Rcd. at 5016–62, ¶ 9.

**13.** In requesting comment the FCC stated:
SMS messages are text messages directed to wireless devices through the use of the tele-

phone number assigned to the device. When SMS messages are sent between wireless devices, the messages generally do not traverse the Internet and therefore do not include a reference to an Internet domain. However, a message initially may be sent through the Internet as an electric mail message, and then converted by the service provider into an SMS message associated with a telephone number. We seek comment on whether the definition of an MSCM should include messages using such technology and similar methods, and specifically whether it should include either or both

should include any commercial electronic mail message as long as it is sent or delivered to an address that includes a reference to an Internet domain. *Rules and Regulations Implementing the CAN–SPAM Act of 2003 and the TCPA,* 19 FCC Rcd. 15927, 15933, ¶ 16, 2004 WL 1794922 (2004) ("CAN–SPAM Order"). Accordingly, the FCC has decided to include Internet-to-phone SMS messages as messages covered by § 14 of the CAN–SPAM Act because they are initially directed to an address that contains an Internet domain reference. *Id.*[14]

¶ 40 Although the FCC has elected to regulate Internet-to-phone SMS under the CAN–SPAM Act, notably absent in the FCC's order implementing the CAN–SPAM rules is any statement or suggestion that the language of the TCPA is not sufficiently broad to apply to Internet-to-phone SMS calls. Simply put, the FCC's decision in 2004 to regulate prospectively Internet-to-phone SMS messages under the CAN–SPAM Act does not mean the TCPA is inapplicable to the Internet-to-phone SMS calls made by Acacia in 2001 to Joffe's cellular telephone. Moreover, even if the FCC had taken that position, we would be left with the CAN–SPAM Act's plain language that it shall not "be interpreted to preclude or override the applicability" of the TCPA. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986)("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress.").

¶ 41 Application of the TCPA to Internet-to-phone SMS messages does not render the CAN–SPAM Act's regulation of such messages superfluous. Section 7712 of the CAN–SPAM Act is broader than the TCPA. The CAN–SPAM Act applies to all uninvited MSCMs. In contrast, the TCPA applies to only those calls made using an automated dialing system or an artificial or prerecorded voice.

¶ 42 We conclude, therefore, that nothing in the wording, legislative history or FCC implementation of the CAN–SPAM Act demonstrates Congress intended only the CAN–SPAM Act, and not the TCPA, to apply to the SMS text message calls Acacia made to Joffe.

### III. The TCPA Does Not Violate the First Amendment

▇▇▇ ¶ 43 Acacia finally argues the TCPA violates its rights under the First Amendment to the United States Constitution. We have a duty, when possible, to read statutes in a manner that avoids constitutional invalidation. *Zadvydas v. Davis,* 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The parties agree the TCPA creates a content-neutral time, place, and manner restriction on speech. Such a restriction survives a First Amendment challenge if it serves "a significant governmental interest," is "narrowly tailored" to serve that interest, and leaves "open ample alternative channels for communication of the information."

---

of these types of SMS messages described above. We note here that the TCPA and the Commission rules prohibit calls using autodialers to send certain voice calls and text calls, including SMS messages, to wireless numbers. CAN–SPAM NPRM, 19 FCC Rcd. at 5063–64, ¶ 15 (footnotes omitted).

**14.** In its order implementing rules pursuant to § 14, the FCC stated:

We conclude that the definition of MSCM under the CAN–SPAM Act includes any commercial electronic mail message as long as the address to which it is sent or transmitted includes a reference to the Internet and is for a wireless device as discussed above. This holds true regardless of the format of the message, such as audio messages. We believe this interpretation best applies the statutory language to the evolving technology for delivering such messages. Therefore, messages sent using Internet-to-phone SMS technology are among messages covered by section 14 when they include an Internet reference in the address to which the message is sent or delivered. CAN–SPAM Order, 19 FCC Rcd. at 15933–34, ¶ 16. Because phone-to-phone SMS messages do not reference Internet domains, they are not "captured by section 14...." *Id.* at ¶ 17. Such calls are subject to the TCPA. *See supra* note 6.

*Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)(quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Applying these standards, we hold the TCPA does not violate Acacia's First Amendment rights.

■ ¶ 44 The thrust of Acacia's argument is Congress did not articulate any applicable governmental interest because it could not have anticipated SMS messaging technology and thus did not actually consider whether the TCPA could apply to Internet-to-phone SMS. But, as we have discussed, Congress intended the TCPA to apply to advances in automatic telephone dialing technology and to the use of that technology to disrupt the privacy of residential (and business)telephone subscribers.

■ ¶ 45 Protecting the privacy of the home from unwarranted and unrequested intrusions constitutes a significant governmental interest. *E.g., Frisby v. Schultz,* 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (municipal ordinance construed as banning targeted picketing in front of a particular residence serves significant governmental interest of protecting residential privacy). In enacting the TCPA, Congress recognized exactly that:

> The Supreme Court has recognized the legitimacy of reasonable time, place and manner restrictions on speech when the restrictions are not based on the content of the message being conveyed. In 1948, the Court upheld an ordinance banning sound trucks. *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1948). The Supreme Court also has recognized that "in the privacy of the home ... the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *FCC v. Pacifica Found.,* 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). The case upheld an FCC ruling that prohibited the daytime broadcast of indecent language.

S.Rep. No. 102–178, at 4, 1991 U.S.C.C.A.N. 1968, at 1971. Cellular telephones have permeated American life, and have replaced traditional "land line" telephones in many homes and businesses. People keep their cellular phones on their person at nearly all times: in pockets, purses, and attached to belts. Unlike other modes of communication, the telephone commands our instant attention. While junk mail may be thrown away unopened, and television commercials turned off, the telephone demands to be answered. In protecting the privacy of cellular telephone subscribers from automated calls, the TCPA serves a significant governmental interest.

■ ¶ 46 Second, the TCPA is narrowly tailored to serve the governmental interest identified by Congress. In the realm of content-neutral speech restrictions, a statute is narrowly tailored "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restricted alternative." *Id.* at 800, 109 S.Ct. 2746. Through the TCPA, Congress sought to address consumer concerns about telephone solicitations, and in particular, automated calls that burden consumers. By prohibiting only those calls from automatic dialing systems, Congress narrowly tailored the TCPA to achieve this goal in a way not substantially broader than necessary.

¶ 47 Finally, Congress left open many alternative modes of communicating with consumers. For example, the TCPA restricts only calls using automatic telephone dialing systems or a prerecorded voice. Thus, Acacia could have sent its messages by entering the numbers it wished to reach by hand. Other examples include live solicitation calls, and autodialed calls consumers consent to receiving. *See Moser v. FCC,* 46 F.3d 970, 975 (9th Cir.1995).

¶ 48 Therefore, application of the TCPA's restriction on autodialed calls to cellular telephones, including the Internet-to-phone SMS calls at issue here, is narrowly tailored to serve the significant and content-neutral gov-

ernmental interest of protecting consumer privacy from unsolicited telemarketing calls. As applied to Acacia's conduct, the TCPA did not violate its rights under the First Amendment.

## CONCLUSION

¶ 49 By using an automatic dialing system to make Internet-to-phone SMS calls to Joffe's cellular telephone, Acacia violated § 227(b)(1)(A)(iii) of the TCPA. Because the TCPA is a content-neutral regulation narrowly tailored by Congress to further a significant governmental interest, the TCPA does not violate Acacia's First Amendment rights. Accordingly, we affirm the superior court's order granting Joffe partial summary judgment.

CONCURRING: JEFFERSON L. LANKFORD and JOHN C. GEMMILL, Judges.

